

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 23, 2023

**By ECF**

The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Patrick Ndukwe*, 21 Cr. 700 (DLC)

Dear Judge Cote:

    The Government respectfully submits this letter in advance of the sentencing of defendant Patrick Ndukwe, which is currently scheduled for June 30, 2023, at 2:00 p.m.

    As set forth below, the defendant was the central figure in a scheme to defraud Medicaid and to bribe contractors working for New York State. His conduct was deliberate, brazen, and resulted in a loss to the New York State Medicaid Program of more than $2.5 million, the improper steering of approximately $1.2 million in additional business to the defendant's company, and an attempt at an additional $3 million in public funds. The defendant brought others into the fraud scheme, making sure that the fraud machine kept churning for his benefit. And the defendant lied day after day for years, submitting false claims for reimbursement and pushing others to do the same. While ordinary members of the community worked and struggled, the defendant exploited programs designed to fund medical transportation for vulnerable people. Moreover, the defendant bribed employees of New York State contractors in order to advance his fraud scheme, which corrupted an important healthcare program in the social safety net for the neediest New Yorkers.

    The parties have stipulated to an applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 51 to 63 months' imprisonment. For the reasons explained below, a sentence of 63 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

**I. Factual Background**

  *A. Medicaid-Funded Transportation in New York*

   Every state, U.S. territory, and the District of Columbia, has a Medicaid program "designed to provide health coverage for low-income people."[1] While the federal government "establishes certain parameters for all states to follow, each state administers their Medicaid program differently . . . ."[2] In New York, Medicaid provides an essential public service, providing "comprehensive health coverage to more than 7.3 million lower-income New Yorkers."[3] The New York State Department of Health ("DOH"), which administers the federal Medicaid program in New York State, uses Medicaid funds to pay for transportation services for Medicaid beneficiaries who cannot get themselves to medical appointments on foot or via public transit.

   The DOH has a contract with a private company called Medical Answering Services LLC ("MAS") to manage Medicaid-funded transportation services on its behalf in most of New York. MAS fields calls from medical providers and Medicaid beneficiaries to schedule Medicaid-funded transportation services. In doing so, MAS was contractually obligated to distribute business among transportation providers using a rotation system that ensured an equitable distribution. Specifically, when a beneficiary or medical provider called MAS to schedule transportation and did not express a preference for a particular transportation company, MAS policies and its contract with the DOH required MAS to randomly assign that beneficiary to a transportation company based on an electronic rotation system.

   MAS also maintains a system that transportation providers—like the defendant's company, Quality Service Medical Transportation ("Quality")—used to submit "attestations" that trips were completed, so that the transportation provider could receive payments from DOH. To complete an attestation, the transportation provider had to affirm that the trip actually took place and provide identification information for the driver and vehicle that performed the trip.

   At MAS, Customer Service Representatives ("CSRs"), including the defendant's co-conspirators, David Travers and Michelle Martin, were authorized to answer calls from Medicaid enrollees and assign trips to particular transportation providers, such as Quality. CSRs were required to follow all MAS policies, including the equitable distribution requirement imposed by the DOH contract.

  *B. Overview of Fraud and Bribery Scheme*

   Ndukwe owned and operated Quality, which was a car service in the Bronx, New York, that provided Medicaid-funded transportation services. Quality was authorized to bill Medicaid

---

[1] *Program History*, Medicaid.gov, https://www.medicaid.gov/about-us/program-history/index.html (last accessed June 23, 2023).

[2] *Id.*

[3] *New York State Medicaid*, N.Y. Dep't of Health (Feb. 2022), https://www.health.ny.gov/health_care/medicaid/ (last accessed June 23, 2023).

for transportation services that it provided to certain Medicaid-eligible individuals to get them to and from their medical appointments.

However, from approximately May 2017 until approximately March 2020, Ndukwe conspired with others, including Travers and Martin, to steer trips to Quality. In particular, Ndukwe paid approximately $200,000 in bribes to Travers who, in turn, passed approximately half of that amount to other co-conspirators at MAS (the "MAS Co-Conspirators"). Travers recruited other MAS Co-Conspirators into the fraud scheme using the money paid by Ndukwe—including Martin, who ultimately assigned more trips to Quality than any other CSR.

In exchange for these bribes, the MAS Co-Conspirators ensured that Quality received two types of trips. First, they steered trips to Quality that should have been distributed equitably among all eligible transportation providers using the rotation system. By bribing the MAS Co-Conspirators, Ndukwe was able to ensure that a much larger share of business was directed to his company than he would have been entitled to without the bribes. Second, the MAS Co-Conspirators assigned trips to Quality that were never intended to be performed. These 'fake' trips were not completed by Quality—or anyone else. Rather, Ndukwe took these trips 'scheduled' for his business, falsely affirmed to Medicaid that they were performed, and then got paid the fare for the trip. As part of the scheme, Ndukwe personally attested to numerous fraudulent trips that never occurred, and also instructed others at Quality to do so. In those attestations, Ndukwe falsely affirmed that the trips had happened, and he listed or caused to be listed drivers and vehicles that never performed the trips—including some drivers who had never driven for Quality at all.[4]

As the parties have stipulated, the loss attributable to Ndukwe for purposes of the Guidelines was at least $3,500,000, but less than $9,500,000. (*See* Presentence Investigation Report prepared by the U.S. Probation Office dated June 1, 2023 ("PSR") ¶ 9.) For the fraudulently steered trips, Quality earned $1,194,958, which reflects losses to other transportation companies deprived of business that was assigned to Quality in return for bribes. (*Id.* ¶ 9 n.1.) For the outright fake trips, Quality earned at least $2,575,417. (*Id.*) And an additional $3,092,946 in intended loss flows from trips fraudulently assigned to Quality that ultimately were not performed or billed.[5] (*Id.*) Therefore, as the parties have stipulated, the loss attributable to Ndukwe for purposes of the Guidelines is at least $3,500,000.

## II. Procedural History and Guidelines Calculation

On November 15, 2021, the grand jury returned Indictment 21 Cr. 700 (DLC) charging Ndukwe, Martin, and Travers with conspiracy to commit healthcare fraud, healthcare fraud, theft of government funds, and violation of the Anti-Kickback Statute. Ndukwe was also charged with aggravated identity theft. The next day, November 16, 2021, Ndukwe was arrested. At his

---

[4] The MAS bribe-recipients were not Ndukwe's only source for these fake trips. Drivers who worked for Quality also brought fake trips to the company, which Ndukwe and others working at his direction then attested had occurred even though they had not.

[5] Trips could be cancelled for many reasons, including if an enrollee tried to later schedule real transportation or if the enrollee's authorization for transportation ended. In such cases, the trip was already assigned to Quality and only cancelled for reasons external to Quality.

presentment, he was ordered released subject to certain bail conditions. At the initial pretrial conference on December 3, 2021, the Court set trial for April 3, 2023.

On March 10, 2023, two weeks after the Government made its initial production of witness statements pursuant to 18 U.S.C. § 3500, Ndukwe pleaded guilty pursuant to a plea agreement dated March 7, 2023 (the "Plea Agreement"). Ndukwe pleaded guilty to one count of conspiracy to commit healthcare fraud and honest services fraud, in violation of 18 U.S.C. § 1349.

In the plea agreement, the parties stipulated to a Guidelines range of 51 to 63 months' imprisonment. The offense level is 24 based on a base offense level of 7, an 18-level enhancement for loss between $3,500,000 and $9,500,000, a 2-level enhancement for loss to a healthcare program over $2,000,000, and a 3-level reduction for acceptance of responsibility. Plea Agreement at 2-3. The defendant's criminal history category is I, and the resulting Guidelines range is 51 to 63 months' imprisonment. *Id.* at 3. The Probation Office agrees that this Guidelines calculation is correct, PSR ¶ 95, and recommends a sentence of 48 months' imprisonment, PSR at 28.

In the Plea Agreement, the defendant agreed to pay restitution of $2,575,417 and forfeit $3,770,375. Plea Agreement at 1-2; PSR ¶¶ 105-108.

## III. Discussion

### A. *Applicable Law*

As the Court is aware, the Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. Thus, while the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)–(7); *see also Gall*, 552 U.S. at 49–50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence for criminal conduct;
(C)   to protect the public from further crimes of the defendant; and

>   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

### B. The Court Should Impose a Sentence of 63 Months' Imprisonment

In this case, the nature and circumstances of the defendant's offense and the need to promote respect for the law, to provide just punishment, to deter criminal conduct, and to protect the public from future crimes of the defendant all weigh in favor of a sentence of 63 months' imprisonment.

*First*, a substantial prison sentence is appropriate to reflect the seriousness of the defendant's criminal conduct and to provide just punishment for the offense. The defendant's long-running fraud was brazen and effective. And that fraud exploited a government program that provides funding to assist low-income New Yorkers in need of medical aid. Ndukwe bribed the MAS Co-Conspirators to ignore their duties as employees, and to circumvent MAS's obligations as a government contractor. In doing so, he not only gained business by paying insiders, he took that business from other legitimate transportation providers who were trying to compete on an uneven playing field. And he lied day in and day out throughout the scheme, falsely attesting to trips that never happened. His crime was not the product of a one-time mistake or lapse in judgment; it was clever, calculating, concealed, long-running, and lucrative.

There were many victims to Ndukwe's crimes. He stole from other transportation providers who played by the rules. He stole from the New York State Medicaid program. And he took advantage of a system designed to provide essential medical services to low-income patients. Schemes like the defendant's damage the public's trust in important government institutions and programs. For all of these reasons, the public ultimately bears the price of Ndukwe's fraud and his corruption of the Medicaid transportation-reimbursement program. A sentence of 63 months' imprisonment is warranted to provide just punishment and to reflect the seriousness of this offense.

*Second*, a substantial sentence is necessary to deter future criminal conduct. In just the last four years, prosecutors in New York have charged at least twenty defendants working at three different companies for similar Medicaid transportation fraud schemes.[6] These schemes are unfortunately pervasive and remunerative, yet also difficult to detect, investigate, and prosecute.

---

[6] *See Thirteen Defendants Charged With Submitting Millions Of Dollars In False Transportation Claims To Medicaid*, Dep't of Justice (Feb. 14, 2020), *available at* https://www.justice.gov/usao-sdny/pr/13-defendants-charged-submitting-millions-dollars-false-transportation-claims-medicaid (last accessed June 23, 2023); *NYC Transportation Company Owner And Driver Arrested For Defrauding Medicaid Of Over $1 Million*, New York Attorney General (Sept. 17, 2019), *available at* https://ag.ny.gov/press-release/2019/nyc-transportation-company-owner-and-driver-arrested-defrauding-medicaid-over-1 (last accessed June 23, 2023).

Those who engage in Medicaid fraud, including this defendant, must learn that their actions have a real adverse impact on the administration of this vital program, and that defrauding Medicaid will result in significant punishment. A substantial sentence is therefore appropriate to deter others who may be tempted to commit similar frauds. *See, e.g.*, *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime." (quoting *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994))).

*Third*, a substantial sentence is also necessary to promote respect for the rule of law and protect the public from further crimes of the defendant. Within a relatively short period of time, the defendant earned millions of dollars through lies and secret payments. While he has no prior arrests, his sophisticated crime and his efforts to conceal it demonstrate a knowing, considered, and willful series of decisions over a long period of time geared toward stealing large amounts of money earmarked for New Yorkers in need. A substantial sentence is necessary to deter Ndukwe himself from committing future crimes.

Ndukwe's sentencing submission illustrates the need for specific deterrence. Ndukwe's own letter to the Court downplays his lengthy scheme as a "lapse in judgment," and claims "I have always been a law-abiding person." (Def. Ex. 1). And, arguing that the Guidelines "overstate[] the seriousness of the conduct," Ndukwe's sentencing submission dismisses substantial losses attributable to some of the victims of his crime, asserting that "[o]ver half of the loss amount here . . . did not result in a direct loss to any victim"—apparently because Ndukwe does not believe that "a[ny] victim actually experienced a direct loss of the full amount as a result of the criminal conduct." (Dkt 75 ("Def. Ltr.") at 9.) That assessment disregards the corrosive effect that bribery has on both beneficiaries and providers who rely on the fair administration of federal and state programs. And it raises serious concerns about whether Ndukwe truly appreciates and accepts the severity of his actions—including his theft of millions of dollars—such that he would not commit similar crimes in the future.

### C. *Ndukwe's Request for a Non-Incarceratory Sentence Should Be Rejected*

Despite the grave nature and effects of his offense, Ndukwe, who has been out on bail throughout this case, argues that he deserves a sentence of time served. That request, which would be a dramatic departure from the applicable Guidelines range, ignores almost all of the factors discussed above and would be wholly inappropriate in this case. None of the reasons Ndukwe advances in support of his request, either individually or collectively, justify the exceedingly lenient sentence he seeks.

*First*, Ndukwe claims that "a below-guidelines sentence can be appropriate where the defendant has no prior criminal history due to the relationship between the sentence and deterrence." (Def. Ltr. at 7). If that general premise even applies in a case involving this kind of complex and concealed fraud, Ndukwe's lack of criminal history does not justify the dramatic variance—from a range of 51 to 63 months to no time at all—that Ndukwe seeks. As discussed above, contrary to Ndukwe's claims, there is a significant need for specific deterrence. But even if Ndukwe could be taken at his word that he has already been personally deterred, his argument completely ignores the need to deter others from seeking quick profits in the same manner—a need particularly salient in fraud cases. As one district court has explained:

> Unlike defendants in gun and drug cases, who often act without reflection, individuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.

*United States v. Marsh*, No. 10 Cr. 480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011); *see also, e.g.*, *Cavera*, 550 F.3d at 196 ("Where the profits to be made from violating the law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."). That principle is particularly relevant here, where a significant sentence is necessary to adjust the balance of risk and reward for those seeking to commit crimes similar to the ones committed by Ndukwe.

The sole case Ndukwe cites in support of his argument on this point, *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018), only serves to emphasize the importance of general deterrence—and of imposing a significant sentence to accomplish it. The court in *Johnson*, which involved front-running a foreign-exchange trade, relied on significant mitigating factors that are not present in this case, including that the fraud "[did] not directly harm the public interest," was "limited" in both "scope and duration," and fell "at the lower end of [the] spectrum" of "opprobrium deserved by felony white-collar offenses." *Id.* at *5. That is not the case here. And yet, the *Johnson* court still recognized that the "need for general deterrence is particularly acute in the context of white-collar crime," and imposed a prison sentence intended to "make[] it clear that all defendants who commit fraudulent acts . . . are subject to serious sanctions." *Id.* A substantial sentence of incarceration is likewise warranted in this case.

At bottom, Ndukwe's requested sentence proposes that he incur little more than a slap on the wrist, despite having made the calculated decision to orchestrate an extensive, multi-year, multimillion-dollar bribery and fraud scheme. Such a dramatic departure is not warranted in this case, and would send the perverse message that crime actually does pay.

*Second*, Ndukwe claims that he and his family "have already suffered as a result of his arrest and conduct in this case." (Def. Ltr. at 7). While the Government does not doubt that this case has caused difficulties for Ndukwe's family, the responsibility for any such consequences rests squarely with the defendant. He chose to commit a crime—again, for a period of years—that risked having a "life-altering effect" on his family. (*Id.*) While regrettable, any difficulties that Ndukwe's crimes have caused for himself and his family are no justification for the time-served sentence he seeks.

*Third*, Ndukwe asks the Court to "consider the longstanding critique" of the loss table set forth in U.S.S.G. § 2B1.1. But that debate has little to do with the way the Guidelines apply in this case. Here, the Guidelines—driven in part by actual multimillion-dollar losses caused directly by Ndukwe—are reasonable and appropriately reflect the offense conduct. Ndukwe was a central figure in this fraud, and is being held responsible for money that he bribed others to direct to the company he owned. In this case, the fact that the loss table results in a higher Guidelines calculation reflects the gravity of Ndukwe's crime, not any failure of sentencing policy.

To be sure, courts in other dissimilar cases have rejected calculations based on the loss table. In *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), for instance, three defendants were convicted of conspiring to defraud a non-existent investor of an imaginary three-billion-dollar sum. Unlike here, there were no actual losses; the Guidelines, however, driven by the *intended* loss amount, resulted in a recommended sentence of 360 months to life imprisonment—a sentence far exceeding the 20-year statutory maximum. After the district court imposed 20-year sentences, the Second Circuit vacated the sentences as procedurally unreasonable. Judge Underhill wrote a concurrence in that case, which Ndukwe cites (*see* Def. Ltr. at 8), protesting the panel's failure to also address the substantive reasonableness of the sentences. *Corsey*, 723 F.3d at 377–79 (Underhill, J., concurring) (stating flaws in the loss guideline "are magnified where, as here, the entire loss amount consists of intended loss" and lamenting that the Guidelines "treated this pathetic crime as a multi-billion dollar fraud—that is, one of the most serious frauds in the history of the federal courts"). This case bears no resemblance to *Corsey*. Here, there were actual losses and actual victims. Ndukwe actually profited from his illegal conduct, and the Guidelines—including the loss table calculation—reflect actual amounts involved in the defendant's fraud.

Nor is this case like the other decisions Ndukwe cites, which involved securities or commodities frauds where loss may be predicated on changes in the market prices of heavily traded financial instruments, where a defendant could argue that Guidelines loss is more attenuated from the defendant's personal conduct. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) ("Since successful public companies typically issue millions of publicly traded shares—in Impath's case, there were 16.6 million shares of common stock outstanding as of 2003—the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart."). The loss amount in this case reflects significant actual amounts involved in Ndukwe's fraud—amounts representing business actually directed, and payments actually made, to his company. That his fraud was amplified by corruption of an important healthcare program only adds to the argument that the loss amount accurately states or even understates the harm from his offense.

In sum, the sentencing range recommended by the Guidelines is based on Ndukwe's actual theft of millions of dollars, money that lined his pockets at the expense of taxpayers, intended loss that he himself sought, and his personal payment of bribes to obtain business at the expense of other companies that played by the rules. Whatever critiques of the loss table might apply in other cases, here the Guidelines are an entirely appropriate "starting point and . . . initial benchmark" for determining Ndukwe's sentence. *Gall*, 552 U.S. at 46.

## IV. Conclusion

      For the reasons set forth above, the Government respectfully submits that a sentence of 63 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/_____
Kedar S. Bhatia
Jarrod L. Schaeffer
Derek Wikstrom
Assistant United States Attorneys
Tel: (212) 637-2465 / -2270 / -1085

cc:    Counsel of Record (via ECF)